CITY OF MILWAUKEE, WIS., v. SHAILER et al.

(Circuit Court of Appeals, Seventh Circuit. January 3, 1898.)

No. 418.

MUNICIPAL CORPORATION—CONTRACT—DAMAGE.

A city cannot recover damages for failure to complete a tunnel in accordance with a contract which provides that, in case of default on the part of the contractors, the city should complete the work at their expense, when the tunnel, as constructed by the city, is essentially different in plan and cost of construction from that contemplated by the agreement.

In Error to the Circuit Court of the United States for the Eastern District of Wisconsin.

In this case the court directed a verdict in favor of the defendant upon the principal claim, and in favor of the plaintiffs upon the counterclaim. The appeal is by the city alone, and one of the specifications of error, perhaps the only available one, is that the court erred in directing a verdict in favor of the plaintiffs and against the defendant upon the counterclaim. The substance of the amended declaration is that the plaintiffs, Robert A. Shailer and Charles R. Schniglau, citizens of Michigan, on June 30, 1890, entered into a contract with the city of Milwaukee, represented by its board of public works, for the construction, according to plans and specifications, of an intake tunnel under Lake Michigan, with shafts and other connections, at stated prices per lineal foot; that the plans and specifications were unfit and impossible of performance, and that the officers who represented the city in the making of the contract fraudulently withheld from the plaintiffs knowledge which they possessed of the material in the bed of the lake likely to be encountered in the prosecution of the work, and fraudulently furnished information concerning test borings which had been made; that the plaintiffs were thereby deceived, and, after making large expenditures, were unable to proceed with the work, to their damage in the sum of a quarter of a million dollars. The city, besides denying the alleged deceit and the insufficiency of the plans and specifications, answered that the plaintiffs had ratified the contract by proceeding with the work and receiving payments thereon, and by assigning the contract to the Shailer & Schniglau Company, a corporation, which in the same court was prosecuting a suit to recover the balance alleged to be due on the contract, and also pleaded a counterclaim on account of alleged breaches of the contract, consisting in failure and refusal to prosecute and complete the work, according to the plans and specifications, within the time specified, or within a reasonable time thereafter, and in the abandonment of the work before completion. It is also alleged that the board of public works, exercising the authority possessed under the contract and the statute of the state, declared the plaintiffs to be in default, and determined the amount of damages sustained by the city to be $113,266.78, for the recovery of which, and the additional sum of $45,000, claimed as liquidated damages under the provision of the contract for delays in completing the work, judgment was prayed. In the contract and specifications, as they appear in the record, there are the following, with other, provisions: "(1) The drawings form a part of the specifications, and each are hereby declared to be a part of the contract. (2) All the work during its progress, and on its completion, shall conform exactly to the lines and grades shown on the drawings mentioned in the specifications, and given by the engineer in charge, subject to such changes and modifications as the board of public works may deem necessary during its execution. (3) The board of public works, and it only, reserves the right to make any changes in the plans and specifications which they may deem necessary or desirable, and the contractors shall furnish any additional materials and do the work necessitated by such changes; the price of such extra work to be agreed upon by the board of public works and the contractor before the work is commenced. If the changes herein mentioned should diminish the amount of work to be performed or material to be furnished, the amount of the same, at a fair and reasonable valuation, shall be deducted from the contract price. (4) And the

said party of the first part (meaning the contractors) hereby further covenants and agrees, to and with the said city of Milwaukee, that he will complete the said work in manner and form aforesaid on or before the 1st day of June, A. D. 1891, and does hereby mutually agree between the said parties hereto that the said board of public works shall have the right and power, and the same is hereby reserved to said board, to adjust and determine finally all questions—First, as to the proper performance of these presents and the doing of the said work by the said party of the first part, and, in case of the improper or imperfect performance thereof, to suspend the said work at any time, or to order the entire reconstruction of the same, if improperly done, or to relet the same to some other competent party, and, in case the said work shall not be prosecuted with such diligence and with such number of men as to insure its completion within the time limited by these presents, to suspend the said work, and relet the same to some other competent party, or employ men and secure material for the completion of the same, and charge the cost thereof to the party of the first part; and, secondly, as to the amount earned under these presents by the party of the first part according to the true intent and meaning thereof. And it is further mutually agreed that any and every such adjustment and determination by the said board of public works shall be final and conclusive between the said parties to these presents, and binding upon them."

The evidence shows without dispute that the contractors, after constructing the shaft on shore, proceeded from that end with the work of opening the tunnel for the distance of 1,640 feet, when, on October 1, 1891, a deposit of gravel was encountered, from which there came such an influx of water that, notwithstanding all efforts at pumping, the tunnel was filled, and the water rose in the shaft to the level of the lake. On April 6. 1892, the board of public works, on the recommendation of the city engineer that a change of location of the line of the tunnel was necessary on account of the enormous flow of water at the face of the work, which made it impossible to continue on the line prescribed, adopted a resolution that the line "be so changed as to make a detour at a point 25 feet in the rear of the present bulkhead, going south at an angle of about 38 degrees from the present line," but not declaring how far the changed course should be followed, or at what point, if at all, before reaching the other shaft, there should be a return to the original line. On the new course the work progressed for the distance of about 100 feet, and the same obstruction as before was encountered, and further attempt in that direction was abandoned. Under a verbal understanding, the contractors made an effort to escape the obstacle by drifting to the north, and on June 13, 1892, wrote to the chairman of the board, asking a formal order for their protection, and on the ensuing 16th the board made an order "that the contractors * * * be permitted to build a solid bulkhead immediately west of the curve in said tunnel, which deflects to the south, and that they be further permitted to branch from said tunnel at a point immediately west of this bulkhead to the northward for a distance not to exceed 20 feet, and then construct the tunnel on the line due east, ascending at a grade of not to exceed one foot in eight, until they shall have reached a point in the red clay above the water channel eastward of the face of the present easterly excavation upon the old line of the tunnel."

On the 18th the contractors wrote to the secretary of the board acknowledging receipt of a copy of the order, and saying: "We trust that there is no misunderstanding in relation to raising the grade of tunnel, etc. Your resolution says that 'we be permitted to build a solid bulkhead,' etc., and that we be permitted 'to go northward,' etc. It is with the distinct understanding that the proposed change is ordered by the board, and that we will be paid for the expense incurred by reason of said change, that we proceed with the work indicated in said resolution. The writer has no doubt, from his conversation with the board, that this is their intent and meaning; but at the same time, on reading the resolution, it would lead one to think that it was a favor which the board were granting us, and not an order for change in the plans and specifications. Please reply to the above at your earliest convenience, thereby obliging." On the 20th the secretary answered: "* * * The board consents to your request that the line of the tunnel and the grade

thereof be changed. Our resolution is not in the shape of the granting of a favor, but is the act of consenting to the proposed changes, both in the line and in the grade of the tunnel. We do not wish to have it understood as a positive arbitrary order from the board to make such change. There is no doubt as to the understanding that the board proposes to pay for the construction of the tunnel on the proposed line and grade as per your contract with the city for the tunnel work and for the extra expense incurred in hoisting the necessary material to the construction of the tunnel at the higher elevations. If this is not satisfactory, you will please state the points of your objections without delay." On July 20th following the contractors wrote to the chairman of the board explaining what they had been doing, and the difficulties encountered, and, concluding, said: "* * * It seems to us altogether too hazardous an undertaking to proceed without further information as to the extent and character of the pocket which has been encountered, and we therefore do not wish to avail ourselves of the permission granted to do so. We hope. you will deem it advisable to at once have several borings made, and meanwhile we will crowd the work on the lake shaft."

There was further correspondence concerning the proposed borings, which it was supposed would take from one to two months to make, and the contractors turned their attention to the sinking of the other shaft at the crib in the lake. The construction of that shaft was attended with difficulties on account of the breaking in of the sand, creating hollow places under the crib, and frequent letters of complaint on that account were sent to the contractors by officers of the city. On January 3, 1893, the board of public works passed an order, reciting the delinquency of the contractors, and requiring them to proceed on or before the ensuing 20th with the construction of the tunnel and shafts at either one or both ends of the work with such diligence and number of men as to insure early completion of the work, failing which the board would suspend the work, and prosecute its completion, as required and provided by law. To this the contractors, on the ensuing 16th, answered, explaining that work on the shaft had been impracticable on account of the conditions of the weather and ice in the lake, and concluding: "* * * As far as the work from the shore end is concerned, we were under the impression that you did not deem it advisable to proceed further in an easterly direction, and with a radical change of grade, until the sinking of the lake shaft had been successfully accomplished. If we are wrong in the above, and you desire us to proceed from the shore end, please issue at once the necessary order, as provided in the contract, for a change in the plans and specifications. We would respectfully request that you give us a thirty-days extension of the time from the date named in your said communication of January 3d, and we will take advantage of any let-up in the severe winter weather, and before the thirty-days extension has expired we will endeavor to have the work in full operation. Assuring you that it is our purpose and intention to crowd the work to completion with all practicable speed, we remain." Thereupon, on the same day, the board entered an order that the time be extended from the date specified in the order of the 3d for 30 days on the work at the crib and for 10 days on the work from the shore end. On February 8, 1893, the board passed an order "that the city of Milwaukee consents that Shailer & Schniglau may proceed with work on the intake tunnel and shaft without waiving any rights which may be now possessed by them to repudiate the contract for its construction for any cause. This consent is given on condition that all rights now possessed by the city are and shall be preserved."

On February 13th the contractors wrote to the board: "Gentlemen: Under the terms of your communication of the 8th inst. which we understand preserves to us all the rights we would otherwise possess, we shall begin work upon the necessary preparations to proceed with the lake shaft, now in course of construction, during the present week, and shall proceed with the work with all possible dispatch. The shore end of the new intake tunnel having been abandoned upon the line of grade originally called for by the plans and specifications, at a point about 1,600 feet from the shore shaft, it will devolve upon your board to make the necessary changes in the plans and specifications to show us what grade and line you desire us to follow in the prosecution of the work from the shore end, and we request you to do this at the earliest

possible moment, so that there may be no delay on that account. As was verbally stated to you by our Mr. Shailer at the board meeting, held Saturday, 11th inst., after a careful study of the borings submitted to us, it is our settled opinion that the only feasible grade on which this work can satisfactorily continue from the shore end will be at a lower level than that on which we encountered the water and sand stratum. From the boring made at the lake shaft it is apparent that this shaft must be sunk through this same waterbearing stratum of gravel and sand, and which would be encountered at about a grade minus ninety. If it is possible to build the shaft through this stratum, and get into the rock below, it is our opinion, based on borings made, that the tunnel can be successfully constructed at a lower level; but until it is demonstrated that the shaft can be built through said stratum, we deem the successful completion of the work uncertain. * * *" To which on the 15th the secretary of the board answered: "* * * In regard to the shore end of the new intake tunnel having been abandoned, we wish to correct you in stating that the work was abandoned by you, but that neither the line nor grade has been permanently abandoned by this board, although an effort was made to avoid the difficulties by an attempt to get around it to the south, which failed. If you consider the difficulties at the end of the original tunnel too great to be overcome, and you conclude that you can prosecute your work better by lowering the grade sufficiently to avoid the water and sand stratum which you encountered, the board will consent to such grade and change, if you will indicate at what point you propose to commence the same, and how far you propose to extend it before resuming the inclination of the present tunnel. We do not consider that the progress of the work in the tunnel should wait until it is demonstrated that the shaft can be built through the different strata or material, for we entertain no doubt as to the possibility of successfully completing the work. Hoping to hear from you without delay as to the suggested change of grade, I remain." On the 18th the contractors replied: "We are unable to agree with the conclusions stated in the letter from your secretary of the 15th inst., which does not appear to be based on any action of the board. The tunnel stands abandoned on the original grade, in our view. The responsibility, therefore, rests upon the board to act in conformity with the contract, and make such change in the plans and specifications as it may deem necessary or desirable. If the board desires to lower the grade, it will, of course, be necessary to begin far enough back of the bulkhead to avoid flooding from the water encountered in the old drifts. Please give the matter your immediate attention, as we desire to avoid all delay. * * *"

On August 5, 1893, the contractors wrote the board as follows: "As you are doubtless aware, the work of sinking the lake shaft for the new water intake is at a standstill. Under the agreement with you dated February 8, 1893, we have faithfully tried to put down said shaft according to the plans and specifications accompanying our contract for this work. It has been thoroughly demonstrated that it is impracticable, and in our judgment impossible, to sink the shaft through sand to the depth which the boring made on the site indicates as necessary, by underpinning with brick under high pressure. All our men, with the exception of the watchman, are discharged, and are awaiting further orders." To which on the 7th the board replied: "* * * This work, however, must be proceeded with, as it is necessary that the same be completed as speedily as possible. You will therefore oblige this board by stating at your very earliest opportunity as to what you propose to do at either one end or the other towards completing the contract for this work." To that on the 8th the contractors responded: "* * * Regarding the work from the shore end, by referring to our letter, February 13, 1893, you will find our position in the matter, and can only add that we have never received the order we therein requested. * * * It having been demonstrated that the shaft cannot be put down according to the plans and specifications forming a part of our contract, it will devolve upon your board to make the necessary changes in the same, and we hold ourselves in readiness to proceed with the work on receipt of such orders, and compliance with the contract regarding changes."

There followed negotiations for the construction by the contractors of a steel shaft inside of the iron tubing which had been put in, but no agreement was reached, and on October 17, 1893, the board determined, upon a series of

recitals, that the work of the contractors be suspended, and that the board would proceed with the construction and completion of the work. And to a notification of this order the contractors on the 21st responded: "* * * The undersigned utterly dispute the right of said board to take any such action, and repudiate and deny the alleged facts and premises on which the same purports to be based; and they deny the right of the city and of the board of public works to do any work at their expense. If there is any work to be done under the contract between us and the city, we are ready and hereby offer to do it. In the absence of any further communication to the contrary, we cannot but look upon the action taken as a willful repudiation by the city of the contract with us, and a refusal to let us do any further work under the same. * * *" Thereupon the board proceeded with the work, letting the construction of the shaft at the crib to other contractors, and employing laborers by the day to finish the construction of the tunnel, which was accomplished by a detour to the northward for a distance of more than 50 feet from the original line, and continuing by an ascending grade until the stratum of water-bearing gravel had been passed, and then descending and returning gradually towards but reaching the original line only at the point of connection with the crib. The record also shows the order of the board, made after the completion of the work, determining the cost thereof, and declaring the amount chargeable to the defendants in error.

W. H. Timlin, for plaintiff in error.

James G. Flanders, for defendants in error.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

WOODS, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

It is not important, as we conceive, to determine whether, by the order of April 6, 1892, and the subsequent efforts made to find a way around the obstacles encountered in the shore end of the tunnel, there was a permanent, or only a temporary and tentative, abandonment of the line and grade defined by the original plan and specifications. The more reasonable view, perhaps, is that the abandonment should be deemed to have been temporary only, and conditional, while experiments were made to find a more practicable route. The engineer of the city had reported the prescribed line to be impracticable, but the resolution of the board was silent on that point, and was too indefinite in respect to the course and ending of the detour ordered to be regarded as establishing a new line, or as amounting to an irrevocable abandonment of the old line; but it necessarily resulted that, when the work was taken out of the hands of the contractors, and the board of public works undertook to complete the tunnel, it was bound to proceed on the line of the agreement, and could not then change the line, and have the right to charge the contractors with the extra expense of construction. By the contract power was reserved to the board to change the plans and specifications, but with equal explicitness it was provided that the price of extra work caused by a change should be agreed upon by the board and by the contractors before the work should be commenced. Practically, therefore, no change involving extra work could be made except by mutual agreement, and it certainly was not in the power of the board to suspend work by the contractors, and then adopt new plans to be worked out at their expense. If the original line was practicable, the board had its choice, to finish the tunnel on that line

and to look to the contractors for the expense in excess of the contract price, or to treat the contract as at an end and do with the work as it saw fit. If the line was impracticable, the contractors, on the discovery of the fact, were entitled to abandon the work, and it was not in the power of the board to require of them, against their consent, to construct a tunnel on different plans and specifications. That the tunnel as constructed was essentially different in plan and in the cost of construction from that of the contract, the proof in the record leaves no doubt; and, this point being controlling of all others in the case, there was no error in withdrawing the case from the jury. The judgment below is affirmed.